United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| RICHMOND TECHNOLOGIES, INC., a Georgia corporation, d/b/a ePayware, <br><br>Plaintiff, <br>v. <br><br>AUMTECH BUSINESS SOLUTIONS, an unincorporated association; AUMTECH I-SOLUTIONS PVT. LTD, an Indian corporation, DAMIAN JOSEPH POLITO, JENNIFER POLITO, SHANKAR BOSE and ILA BOSE, <br><br>Defendants. | Case No.: 11-CV-02460-LHK <br><br>ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR TRO; GRANTING MOTION FOR SUBSTITUTED SERVICE; DENYING MOTIONS TO DISMISS |

This case is before the Court for determination of the following four motions: (1) Plaintiff's motion for substituted service pursuant to Rule 4(f)(3); (2) a motion to dismiss for lack of personal jurisdiction, defective summons, and defective service brought by Defendants Aumtech i-Solutions Pvt. Ltd., Shankar Bose, and Ila Bose; (3) a motion to dismiss for improper venue brought by Defendants Aumtech Business Solutions, Jennifer Polito, and Damian Joseph Polito; and (4) Plaintiff's renewed motion for a temporary restraining order and preliminary injunction. The Court heard oral argument on June 23, 2011. For the reasons discussed below, the Court GRANTS Plaintiff's motion for substituted service, DENIES Defendants' motions to dismiss, and GRANTS

1

Case No.: 11-CV-02460-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR TRO; GRANTING MOTION FOR
SUBSTITUTED SERVICE; DENYING MOTIONS TO DISMISS

1   in part and DENIES in part Plaintiff's motion for a temporary restraining order.  The Court will

2   hold a preliminary injunction hearing on August 1, 2011.

3       **I.  Background**

4           **A.  The Parties**

5           Plaintiff Richmond Technologies, doing business as ePayware, is a company that provides

6   enterprise resource planning ("ERP") software for financial service companies who provide credit

7   card terminals to merchants.  Compl. ¶ 1.  ePayware originally existed as a corporation

8   headquartered in San Jose, California.  Compl. ¶ 23.  However, on October 12, 2009, Plaintiff

9   Richmond Technologies, Inc. acquired the assets of ePayware.  Compl. ¶ 25.  Plaintiff contends that

10  pursuant to this acquisition, it became the successor in interest to ePayware's contracts and began

11  doing business as ePayware.  *Id.*  Plaintiff Richmond Technologies is a Georgia corporation, with

12  its principal place of business in Alpharetta, Georgia.  Compl. ¶ 13.

13          Defendant Aumtech i-Solutions Pvt. Ltd. ("Aumtech India") is a corporation organized

14  under the laws of India, with its principal place of business in New Delhi, India.  Compl. ¶ 14.

15  Plaintiff alleges that Defendants Shankar and Ila Bose, a married couple, own and manage Aumtech

16  India.  *Id.*  Shankar Bose is Aumtech India's Chief Executive Officer, and Ila Bose is Aumtech

17  India's Chief Technology Officer.  *Id.*  Both Shankar and Ila Bose are Indian nationals residing in

18  India.  Compl. ¶¶ 15-16.

19          Defendant Aumtech Business Solutions ("Aumtech America") is a recently formed

20  company located in Ventura, California.  Compl. ¶ 13.  Plaintiff describes Aumtech America as "an

21  unincorporated association consisting of Damien Joseph Polito, Jennifer Polito, and the principals

22  of Aumtech i-Solutions Pvt. Ltd (Shankar Bose and Ila Bose)."  Compl. ¶ 13.  However, Defendants

23  claim that Aumtech America is a newly formed limited liability company, of which Jennifer Polito

24  is the President and Aumtech India is a member.  *See* Decl. of Jennifer Polito ISO Mot. to Dismiss

25  for Improper Venue ("Jennifer Polito Venue Decl.") ¶¶ 4-5, ECF No. 43; Decl. of Shankar Bose

26  ISO Opp'n to Mot. for TRO ("Shankar Bose TRO Decl.") ¶ 4, ECF No. 52.  Shankar Bose is

27  Partner and Business Head of Aumtech America, and Ila Bose is Aumtech America's Chief

28

Case No.: 11-CV-02460-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR TRO; GRANTING MOTION FOR
SUBSTITUTED SERVICE; DENYING MOTIONS TO DISMISS

**United States District Court**
For the Northern District of California

1   Technology Officer.  Compl. ¶¶ 15-16.  Aumtech America's fictitious business name statement,

2   filed with the Ventura County Recorder, lists Defendant Damian Joseph Polito as owner.  Compl.

3   ¶ 13.  Nonetheless, Damian Polito claims that he works as a prop maker for film production

4   companies and does not hold a position with, or perform work on behalf of, Aumtech America.

5   Decl. of Damian Joseph Polito ISO Mot. to Dismiss for Improper Venue ("Joseph Polito Venue

6   Decl.") ¶¶ 4-5.  Damian and Jennifer Polito are married and reside in Ventura, California.

7                    **B.  Contractual Relationships between the Parties**

8            On January 31, 2007, when it was still based in San Jose, ePayware entered into a

9   Memorandum of Understanding ("MoU") with Aumtech India.  Compl. ¶ 23; Decl. of Sandeep

10  Menon in Supp. of Pl's Mot. for TRO ("Menon Decl.") ¶ 4 & Ex. A.  The MoU created a "Teaming

11  Agreement" pursuant to which Aumtech India developed enterprise resource planning software for

12  ePayware and maintained the enterprise resource planning modules of ePayware's customers.

13  Compl. ¶ 23; Menon Decl. ¶ 5 & Ex. A at 2-3.  Under the terms of the MoU, ePayware agreed to

14  pay Aumtech India a fee of $4,000 per month, to be reassessed after six months, for leasing out the

15  services of Shankar Bose.  Menon Decl. Ex. A at 6.  The MoU also required Aumtech India to

16  provide weekly progress reports and monthly performance and expense reports to ePayware.  *Id.*

17  The terms of the MoU limit its scope to a "specific period of twenty-four months," which could be

18  extended if both parties agreed in writing.  *Id.* at 2.

19           On September 15, 2009, ePayware and Aumtech India entered into a second contract

20  described as a Confidentiality and Non-Disclosure Agreement ("Non-Disclosure Agreement" or

21  "NDA").  Menon Decl. ¶ 4 & Ex. B.  The Non-Disclosure Agreement contains various provisions

22  that prohibit Aumtech India from disclosing or using confidential information, soliciting

23  ePayware's employees or consultants for one year following Aumtech India's term of employment,

24  or entering into any agreement with ePayware's customers or clients for one year following the term

25  of employment.  Menon Decl. Ex. B at 2-3.  The Non-Disclosure Agreement also contains a

26  provision by which Aumtech India agreed not to compete with ePayware "with similar product and

27

28

Case No.: 11-CV-02460-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR TRO; GRANTING MOTION FOR
SUBSTITUTED SERVICE; DENYING MOTIONS TO DISMISS

1    or Service using its technology" for a period of one year following Aumtech India's term of

2    employment with ePayware.  *Id.* at 3.

3        ePayware also had a contractual agreement with Defendant Jennifer Polito.  According to

4    the Complaint, Jennifer Polito joined ePayware as a customer support and help desk executive on

5    January 17, 2007.  Compl. ¶ 28.  Plaintiff claims that on January 17, 2007, Ms. Polito signed a

6    Confidentiality and Non-Disclosure Agreement that contained many of the same material terms as

7    the Non-Disclosure Agreement signed by Aumtech India.[1]  Compl. ¶ 29.  Jennifer Polito terminated

8    her employment with ePayware on March 18, 2011.  Compl. ¶ 30.

9        **C.  Plaintiff's Allegations**

10        In its Complaint, Plaintiff alleges that, beginning sometime in 2010, Defendant Aumtech

11   India "hatched a plan" with former ePayware employee Jennifer Polito and her husband Damian

12   Polito to market Aumtech India's software development and maintenance services directly to

13   ePayware's clients.  Compl. ¶ 4.  Plaintiff claims that the individual Defendants created Aumtech

14   America in April 2010 and prepared to launch this competing venture over the following year.

15   Compl. ¶¶ 4-5.  As part of the preparations, Plaintiff alleges that Aumtech India employees ceased

16   using their ePayware email addresses to correspond with ePayware's customers and instead began

17   using their Aumtech email accounts.  Compl. ¶ 6.  Plaintiff also contends that Jennifer Polito used

18   three different programs to delete data from the hard drive of her ePayware-issued computer before

19   returning the computer to Plaintiff.  Compl. ¶ 30.  After Jennifer Polito resigned from ePayware on

20   March 18, 2011, Plaintiff alleges that she immediately joined Aumtech America as its President.

21   Compl. ¶ 5.  Thereafter, Aumtech America has allegedly offered the same services offered by

22   ePayware and encouraged ePayware's clients to terminate their contracts and sign up with Aumtech

23   America.  CompL. ¶ 7.  Specifically, Plaintiff claims that Jennifer Polito contacted ePayware client

24   FirstPay Solutions, LLC and encouraged FirstPay to switch to Aumtech America.  Compl. ¶ 32.

25

26

27   _____

[1] Although Plaintiff has submitted a copy of the Non-Disclosure Agreement signed by Aumtech
India, it has not submitted a copy of Jennifer Polito's Non-Disclosure Agreement in connection with
the pending motions.

28

4

Case No.: 11-CV-02460-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR TRO; GRANTING MOTION FOR
SUBSTITUTED SERVICE; DENYING MOTIONS TO DISMISS

**United States District Court**
For the Northern District of California

1  Aumtech America also marketed its services at a trade show in San Diego on May 10-12, 2011.

2  Compl. ¶ 8.

3       On May 16, 2011, after learning of the alleged activities, Plaintiff terminated its software

4  development and maintenance agreement with Aumtech India.  Menon Decl. ¶ 7.  Plaintiff then

5  demanded that Aumtech India release its software source code to Plaintiff so that Plaintiff could

6  transition its software support and development to another vendor.  Compl. ¶ 36.  Plaintiff claims

7  that it has paid for the software development and maintenance provided by Aumtech India and that

8  it needs the source code in order to fulfill its obligations to its customers.  Compl. ¶ 37; Menon

9  Decl. ¶ 11.  According to Plaintiff, Aumtech India has refused to release the source code unless

10  ePayware first provides a payment of $20,000.  Compl. ¶ 36; Menon Decl. ¶ 9.

11       On May 20, 2011, Plaintiff filed the instant action in the United States District Court for the

12  Northern District of California.  The Complaint asserts seven claims for relief: (1) breach of written

13  contract against Aumtech India; (2) breach of written contract against Jennifer Polito; (3) violations

14  of the California Unfair Competition Law, Cal. Bus. & Profs. Code § 17200; (4) intentional

15  interference with contract; (5) negligent interference with contract; (6) declaratory relief against

16  Jennifer Polito and Aumtech India; and (7) unjust enrichment.  On May 23, 2011, Plaintiff filed an

17  *ex parte* motion for a temporary restraining order that would (1) compel Defendant Aumtech India

18  and its principals to release the source code to ePayware, and (2) enjoin Defendants from competing

19  with ePayware in violation of the Non-Disclosure Agreement.  The Court denied Plaintiff's motion

20  without prejudice on grounds that Plaintiff had not satisfied the requirements of Federal Rule 65(b)

21  for issuance of a TRO without notice to the adverse party.  *See* Order Denying Ex Parte Motion for

22  TRO Without Prejudice, ECF No. 17.  Plaintiff has now provided notice to all parties, and on June

23  3, 2011, Plaintiff renewed its motion for a TRO and preliminary injunction.  Also on June 3, 2011,

24  Defendants moved to dismiss for lack of personal jurisdiction and improper venue, and Plaintiff

25  moved for an order permitting it to serve the India-based defendants by substituted service on their

26  Los Angeles-based counsel.  The Court held a hearing on all four motions on June 23, 2011, and

27  will now consider each in turn.

28

5

Case No.: 11-CV-02460-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR TRO; GRANTING MOTION FOR
SUBSTITUTED SERVICE; DENYING MOTIONS TO DISMISS

**II. Motion to Dismiss for Lack of Personal Jurisdiction**

    **A. Legal Standard**

    Defendants Aumtech India, Shankar Bose, and Ila Bose (collectively, the "Indian Defendants") move to dismiss pursuant to Rule 12(b)(2) on grounds that the Court lacks personal jurisdiction over each of them.[2]  When a defendant moves to dismiss for lack of personal jurisdiction, "the plaintiff bears the burden of demonstrating that jurisdiction is appropriate." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004).  Because this Court has not conducted an evidentiary hearing, Plaintiff "need only make a prima facie showing of jurisdictional facts." *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990).  At this stage of the proceeding, uncontroverted facts contained in the Complaint are taken as true, and "[c]onflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor." *Schwarzenegger*, 374 F.3d at 800.

    Where, as here, there is no federal statute that governs personal jurisdiction, the Court must apply the law of the state in which it sits.  *Schwarzenegger*, 374 F.3d at 800.  In this case, "[b]ecause California's long-arm jurisdictional statute is coextensive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same." *Id.* at 800-01.  That is, for this Court to exercise personal jurisdiction over the Indian Defendants, each Defendant "must have at least 'minimum contacts' with the relevant forum such that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Id.* at 801 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  A federal court may

---

[2] The Indian Defendants also moved to dismiss pursuant to Rule 12(b)(4) and (5) for insufficient process and insufficient service of process.  The Indian Defendants claim that Plaintiff served them via email with a copy of the summons that did not contain the Clerk's signature or the Court's seal.  However, Plaintiff served the Indian Defendants by email solely to give them notice of the pending motion for TRO and preliminary injunction.  Plaintiff does not contend that such service is sufficient and instead seeks to serve the Indian Defendants pursuant to Rule 4(f)(3).  If a district court determines that service of process is insufficient, the court may exercise discretion in determining whether to dismiss the action or simply quash service of process.  *Stevens v. Security Pac. Nat. Bank*, 538 F.2d 1387, 1389 (9th Cir. 1976); *see also, e. g., Arasan Chip Systems, Inc. v. Sonix Technology Co. Ltd.*, No. 5:09-CV-02172 JF, 2010 WL 890424, at *1 (N.D. Cal. Mar. 8, 2010).  Because the Court has determined that service pursuant to Rule 4(f)(3) is proper, as discussed below, it is not appropriate to dismiss the action under Rule 12(b)(4) or (5) at this time.  Additionally, as Plaintiff does not contend that the emailed documents constitute effective service, there is no need to quash service at this time.

6

Case No.: 11-CV-02460-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR TRO; GRANTING MOTION FOR SUBSTITUTED SERVICE; DENYING MOTIONS TO DISMISS

United States District Court
For the Northern District of California

1   exercise either general or specific jurisdiction over a non-resident defendant.  General jurisdiction

2   exists where a defendant has "continuous and systematic" contacts with the forum state such that

3   the defendant may be "haled into court in the forum state to answer for any of its activities

4   anywhere in the world."  *Schwarzenegger*, 374 F.3d at 801.  Specific jurisdiction is more limited in

5   scope and can be exercised where the defendant has sufficient minimum contacts with the forum

6   state, and the plaintiff's claims arise out of those contacts.  *Id.* at 801-02.

7       **B.  Analysis**

8       In this case, Plaintiff does not allege that the Court has general personal jurisdiction over the

9   Indian Defendants.  Accordingly, the Court need determine only whether it can exercise specific

10   personal jurisdiction over these Defendants.  The Ninth Circuit has developed a three-prong test for

11   analyzing claims of specific personal jurisdiction:

> (1)  The non-resident defendant must purposefully direct his activities or
> consummate some transaction with the forum or resident thereof; or perform
> some act by which he purposefully avails himself of the privilege of conducting
> activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2)  the claim must be one which arises out of or relates to the defendant's forum-
> related activities; and
>
> (3)  the exercise of jurisdiction must comport with fair play and substantial
> justice, i.e. it must be reasonable.

17   *Schwarzenegger*, 374 F.3d at 802.  The plaintiff bears the burden of establishing the first two prongs

18   of the test.  *Id.*  "If the plaintiff succeeds in satisfying both of the first two prongs, the burden then

19   shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be

20   reasonable."  *Id.*  (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-78 (1985)).

21       **1.    Purposeful Availment**

22       The first prong of the Ninth Circuit's test "ensures that a defendant will not be haled into a

23   jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral

24   activity of another party or a third person."  *Yahoo! Inc. v. La Ligue Contre Le Racisme Et*

25   *L'Antisemitisme*, 379 F.3d 1120, 1124 (9th Cir. 2004) (quoting *Burger King*, 471 U.S. at 475).

26   Typically, a "purposeful availment" analysis is used in cases sounding in contract, while a

27   "purposeful direction" analysis is more often used in cases sounding in tort.  *Schwarzenegger*, 374

28

7

F.3d at 802.  Here, although some of Plaintiff's claims sound in tort, they all arise out of the

Defendants' contractual relationship with ePayware.  Accordingly, the Court will apply a

purposeful availment analysis in evaluating Defendants' contacts with California.  *See Sher*, 911

F.2d at 1362 (applying purposeful availment analysis where some of plaintiff's claims sounded in

tort, but all arose out of a contractual relationship).

### a.   Aumtech India's Contacts

Plaintiff argues that Defendant Aumtech India purposefully availed itself of the privilege of

conducting activities in California by entering into a continuing contractual relationship with

ePayware, which was based in San Jose, California.  The Court agrees that Aumtech India's

business relationship with ePayware establishes sufficient minimum contacts for the exercise of

specific personal jurisdiction.  Defendants are correct, of course, that a contract alone does not

automatically establish minimum contacts supporting personal jurisdiction.  *See Burger King*, 471

U.S. at 478 ("If the question is whether an individual's contract with an out-of-state party alone can

automatically establish sufficient minimum contacts in the other party's home forum, we believe the

answer clearly is that it cannot.").  However, it is also true that jurisdiction "may not be avoided

merely because the defendant did not *physically* enter the forum State."  *Id.* at 476.  Rather, the

Court must take a "highly realistic approach" and evaluate factors such as "prior negotiations and

contemplated future consequences, along with the terms of the contract and the parties' actual

course of dealing" to determine whether the Aumtech India has sufficient contacts with California

to support the exercise of specific personal jurisdiction.  *Id.* at 479.

In this case, Aumtech India entered into a business relationship with ePayware that

contemplated ongoing obligations to ePayware, its employees, and its customers in California.

Although Aumtech India performed its obligations from its offices in New Delhi, India, the MoU

required weekly and monthly reports to ePayware in California.  Menon Decl. Ex. A at 6.  The

MoU also required Aumtech India to provide tech support its U.S.-based clients, *id.* at 5, and

Defendants have acknowledged that at least some of ePayware's clients are based in California.  *See*

Jennifer Polito Venue Decl. ¶ 11 (stating that ePayware had clients "in Southern California,

Case No.: 11-CV-02460-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR TRO; GRANTING MOTION FOR
SUBSTITUTED SERVICE; DENYING MOTIONS TO DISMISS

United States District Court
For the Northern District of California

including Intuit, International Processing Solutions, Cardready and APPS").  Moreover, it appears that even after ePayware was acquired by Richmond Technologies, which is based in Georgia, Aumtech India continued to work closely with California-based ePayware employee Jennifer Polito to identify client needs and customize software accordingly.  *See* Compl. ¶ 28 (noting that after the 2009 acquisition, Jennifer Polito "interfaced with clients to gather their business and technical requirements and worked with Aumtech India to customize the software to fulfill these requirements").

Additionally, the Non-Disclosure Agreement signed by Aumtech India in 2009 includes a choice-of-law clause providing that the agreement "is governed exclusively by and construed in accordance with the law of the State of California."  Menon Decl. Ex. A at 3, ¶ 11.  While such a choice-of-law provision, standing alone, is not sufficient to confer jurisdiction, it lends further support to Plaintiff's contention that Aumtech India deliberately affiliated itself with California and that the possibility of litigation in California should have been reasonably foreseeable.  *See Burger King*, 471 U.S. at 482 (finding that a choice-of-law provision, when combined with a long-standing relationship with the forum state, "reinforced [the defendant's] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there").  Finally, it is significant that Aumtech India is alleged to have breached provisions of these contracts by joining with California resident Jennifer Polito to form a company organized under California laws.  Based on these facts, the Court finds that Aumtech India purposefully availed itself of the privilege of conducting activities in California and created "continuing obligations" to California residents sufficient to establish the minimum contacts required for personal jurisdiction.  *See Burger King*, 471 U.S. at 475-76 ("where the defendant . . . has created 'continuing obligations' between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there") (citation omitted).

### b.  Shankar and Ila Bose's Contacts

As to Defendants Shankar and Ila Bose, Defendants are correct that generally an individual is not subject to personal jurisdiction based on acts undertaken in his or her corporate capacity.

Case No.: 11-CV-02460-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR TRO; GRANTING MOTION FOR
SUBSTITUTED SERVICE; DENYING MOTIONS TO DISMISS

1   *Club Car, Inc. v. Club Car (Quebec) Import, Inc.*, 362 F.3d 775, 784 (11th Cir. 2004), *abrogated on*

2   *other grounds as recognized by Diamond Crystal Brands, Inc. v. Food Movers Intern., Inc.*, 593

3   F.3d 1249, 1258 & n.7 (11th Cir. 2010); *see also Davis v. Metro Productions, Inc.*, 885 F.2d 515,

4   520 (9th Cir. 1989) ("a person's mere association with a corporation that causes injury in the forum

5   state is not sufficient in itself to permit that forum to assert jurisdiction over the person").

6   Defendants do not dispute that Shanka and Ila are the principals of Aumtech India.  However, the

7   corporation has approximately 10 employees, Compl. ¶ 14, and Plaintiff has not argued that

8   Aumtech India has no separate existence such that it might be treated as the alter ego of Ila and

9   Shankar.  *See Flynt Distributing Co., Inc. v. Harvey*, 734 F.2d 1389, 1393-94 (9th Cir. 1984)

10   (indicating that where a corporation is the alter ego of its owners, jurisdiction over the corporation

11   supports jurisdiction over the owners).  Thus, the Court agrees with Defendants that, absent facts

12   suggesting that Ila and Shankar's contacts with ePayware went beyond their contacts as officers of

13   Aumtech India, Ila and Shankar cannot be subject to personal jurisdiction based solely upon

14   Aumtech India's contractual relationship with ePayware.  *See Club Car*, 362 F.3d at 784-85

15   (finding personal jurisdiction over corporation's president because his contacts "went beyond his

16   visits to the state as CCQ president" and because he stood to gain personally from an agreement he

17   induced by personally guaranteeing the corporation's debts).

18         On the other hand, where individual defendants are "primary participants in an alleged

19   wrongdoing," their status as employees of a corporation "does not somehow insulate them from

20   jurisdiction."  *Calder v. Jones*, 465 U.S. 783, 790 (1984); *see also Wolf Designs, Inc. v. DHR Co.*,

21   322 F. Supp. 2d 1065, 1072 (C.D. Cal. 2004) (stating that the corporate form may be ignored for

22   purposes of personal jurisdiction "by virtue of the individual's control of, and direct participation in

23   the alleged activities").  Here, Plaintiff has alleged that Shankar and Ila Bose were primary

24   participants in orchestrating the alleged breach and interference with Aumtech India's contracts.

25   More importantly, Plaintiff has alleged that Shankar and Ila Bose affirmatively reached out to

26   California in order to form a new business relationship with California resident Jennifer Polito and

27   to organize a new company under California law.  It is clear that Shankar and Ila hold "core

28

Case No.: 11-CV-02460-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR TRO; GRANTING MOTION FOR
SUBSTITUTED SERVICE; DENYING MOTIONS TO DISMISS

1    management" positions in Aumtech America as Partner/Business Head and Chief Technology

2    Officer, respectively.  *See* Decl. of Shirish Gupta ISO Mot. for TRO ¶ 4 & Ex. L.  Defendants have

3    not denied that Shankar and Ila were primary participants in creating Aumtech America.  Thus, by

4    taking the lead role in forming a business relationship with a California resident and forming a

5    business entity organized under California law, Shankar and Ila Bose have purposefully availed

6    themselves of the privilege of conducting activities in California and invoked the benefits and

7    protections of its laws.  Based on these facts, Plaintiff has made a prima facie showing sufficient to

8    satisfy the first prong of the Ninth Circuit's test for specific personal jurisdiction.

### 2.        Arising Out of Forum-Related Activities

10           As to the second prong of the test, the Court finds that Plaintiff's claims arise out of and

11   relate to the Indian Defendants' California-related activities.  In determining whether a plaintiff's

12   claims arise out of the defendant's forum-related activities, the Ninth Circuit applies a "but-for"

13   test.  *Menken v. Emm*, 503 F.3d 1050, 1058 (9th Cir. 2007).  That is, but for the Indian Defendants'

14   contacts with California, would Plaintiff's claims against Aumtech India have arisen?  *See Mattel,*

15   *Inc. v. Greiner and Hausser GmbH*, 354 F.3d 857, 864 (9th Cir. 2003).  In this case, the majority of

16   Plaintiff's claims allege either breach of contract or tortious interference with contract.  These

17   claims are based on the contractual relationships described above and could not have arisen but for

18   Aumtech India's contacts with California residents ePayware, Jennifer Polito, and Aumtech

19   America.  Had Aumtech India not entered into contracts with then California-based ePayware, the

20   basis for Plaintiff's claims simply would not exist.  Likewise, had Ila and Shankar Bose not availed

21   themselves of California law in order to form a company with California resident Jennifer Polito,

22   Plaintiff would have no claims against them.  Thus, Plaintiff has shown that its claims arise out of

23   the Indian Defendants' contacts with California.

### 3.        Reasonableness

25           Because Plaintiff has satisfied the first two prongs of the Ninth Circuit's test for specific

26   personal jurisdiction, the burden shifts to Aumtech India to present a compelling case that the

27   exercise of personal jurisdiction would be unreasonable.  *Schwarzenegger*, 374 F.3d at 802.  In

28

11

1    evaluating the reasonableness of exercising jurisdiction, courts consider factors such as "the extent

2    of defendant's purposeful interjection into the forum state; the burden on the defendant; the

3    plaintiff's interest in convenient and effective relief; the most efficient forum for judicial resolution

4    of the dispute; the forum state's interest in adjudicating the dispute; and the extent of the conflict

5    with the sovereignty of the defendant's state." *Sher*, 911 F.2d at 1364.

6         In arguing that the exercise of jurisdiction would be unreasonable, Defendants state only that

7    their contacts with California are not sufficient to justify the "unreasonable burden" of requiring

8    them to litigate 8,000 miles away from their place of residence.  Reply ISO of Mot. to Dismiss for

9    Lack of Personal Jurisdiction at 1.  However, the Ninth Circuit has recognized that "modern

10   advances in communications and transportation have significantly reduced the burden of litigating

11   in another country." *Sinatra v. National Enquirer, Inc.*, 854 F.2d 1191, 1199 (9th Cir. 1988).  Thus,

12   in order to satisfy their burden to present a "compelling case" against jurisdiction, Defendants must

13   do more than simply claim, without elaboration, that litigation in a distant country presents an

14   unreasonable burden.[3]  Defendants have not alleged that litigation in California would present a

15   serious financial or physical hardship, nor have they suggested that India or some other state has a

16   greater interest in the litigation or would provide a more efficient forum for resolving the dispute.

17   Given the degree of purposeful interjection involved in starting a company in California, and

18   Plaintiff's claimed interest in avoiding immediate and irreparable harm, the factors in the

19   reasonableness analysis appear to favor the exercise of jurisdiction in this case.  Thus, the Court

20   finds that Defendants have not satisfied their burden to "to 'present a compelling case' that the

21   exercise of jurisdiction would not be reasonable." *Schwarzenegger*, 374 F.3d at 802.

22   _____

23   [3] Indeed, the Aumtech America website represents that its core team members, including Shankar
     and Ila Bose, "have been in the west coast of US . . . for the last three decades."  Decl. of Shirish
     Gupta ISO Mot. for TRO Ex. L.  If this is true, it does not help Defendants' argument that the

24   exercise of personal jurisdiction would be unreasonable.  Defendants cannot claim a 30-year
     presence on the West Coast on a public website, while also arguing to this Court that litigating in

25   California would be unreasonably burdensome.  The Court also notes that both Shankar and Ila
     Bose appear to use a phone number with a San Jose area code.  *See* Menon Decl. Ex. G (email from

26   Ila Bose listing a United States phone number with a "408" area code); Decl. of Shankar Bose in
     Opp'n to Renewed TRO Mot., Exs. A-I (numerous emails from Shankar Bose listing a United

27   States phone number with a "408" area code).  As Defendants pointed out at the motion hearing,
     however, given the existence of Internet-based calling, the significance of these phone numbers is

28   not clear.

12

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    Based on the foregoing analysis, Plaintiff has made a prima facie showing that the Indian

2    Defendants are subject to personal jurisdiction in this Court.  As the Indian Defendants have failed

3    to show that the exercise of personal jurisdiction would be unreasonable, the motion to dismiss for

4    lack of personal jurisdiction is DENIED.

5    **III. Motion to Dismiss for Improper Venue**

6        **A.  Legal Standard**

7        Under Federal Rule of Civil Procedure 12(b)(3), a defendant may move to dismiss a

8    complaint for improper venue.  Once the defendant has challenged the propriety of venue in a given

9    court, the plaintiff bears the burden of showing that venue is proper.  *Piedmont Label Co. v. Sun*

10   *Garden Packing Co.*, 598 F.2d 491, 496 (9th Cir. 1979).  When considering a motion to dismiss

11   pursuant to Rule 12(b)(3), a court need not accept the pleadings as true and may consider facts

12   outside of the pleadings.  *Murphy v. Schneider National, Inc.*, 362 F.3d 1133, 1138 (9th Cir. 2004).

13   Pursuant to 28 U.S.C. § 1406(a), if the court determines that venue is improper, the court must

14   either dismiss the action or, if it is in the interests of justice, transfer the case to a district or division

15   in which it could have been brought.  Whether to dismiss for improper venue, or alternatively to

16   transfer venue to a proper court, is a matter within the sound discretion of the district court.  *See*

17   *King v. Russell*, 963 F.2d 1301, 1304 (9th Cir. 1992).

18       **B.  Analysis**

19       Defendants Jennifer Polito, Damian Polito, and Aumtech America (collectively, the

20   "American Defendants") have moved to dismiss, or in the alternative to transfer to the Central

21   District of California, for improper venue.[4]  Because subject matter jurisdiction in this case is based

22   on diversity of citizenship, venue is governed by 28 U.S.C. § 1391(a).  Under § 1391(a), a civil

23   action may be brought:

24   

---

25   [4] Defendants also moved to transfer this case to the Central District of California for the
     convenience of the parties and witnesses pursuant to 28 U.S.C. § 1404(a).  The Court expedited the
26   hearing on Defendants' motion to dismiss for improper venue in order to ascertain whether venue in
     this District was proper before ruling on Plaintiff's motion for temporary restraining order and
27   preliminary injunction.  However, in order to narrow the issues considered on an expedited basis,
     the Court chose to defer consideration of the § 1404(a) motion.  Defendants are free to renew their
28   § 1404(a) motion for consideration on a non-expedited basis.

13

only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

In addition, § 1391(d) provides that "[a]n alien may be sued in any district." This provision reflects the "long-established rule" that suits against "aliens," or persons not residing in the United States, "are wholly outside the operation of all the federal venue laws." *Brunette Mach. Works, Limited v. Kockum Industries, Inc.*, 406 U.S. 706, 714 (1972). Accordingly, the residence of foreign defendants, including the Indian Defendants in this case, is typically disregarded for purposes of determining venue. *See* 14D Wright and Miller, Fed. Prac. & Proc. § 3810 (3d ed. 2011) ("If an alien is joined as a defendant with one or more non-alien defendants, then venue is proper in any district in which the suit could have been brought against the non-alien defendants alone."); *see also Samra v. Johal*, Nos. CIV. S-08-2587 LKK/GGH, CIV. S-08-2589 LKK/GGH, 2009 WL 306634, at *2 (E.D. Cal. Feb. 5, 2009); *International Flavors & Fragrances Inc. v. Van Eeghen Intern. B.V.*, No. 06 Civ. 490(JFK), 2006 WL 1876671, at *6 (S.D.N.Y. July 6, 2006); *In re Triton Ltd. Securities Litigation*, 70 F. Supp. 2d 678, 683 (E.D. Tex. 1999).

Because Defendants Damian Polito, Jennifer Polito, and Aumtech America all reside in the Central District of California, venue is proper in that district under § 1391(a)(1),[5] and § 1391(a)(3) does not apply. Plaintiff does not claim that any of the defendants resides in the Northern District of California, such that venue in this District would be proper under § 1391(a)(1). Rather, Plaintiff claims that venue is proper because a substantial part of the events or omissions giving rise to the claim occurred in this District, pursuant to § 1391(a)(2). Plaintiff argues that venue is proper under

---

[5] For purposes of venue, a corporation is deemed to reside in any district in which it is subject to personal jurisdiction at the time the action was commenced. 28 U.S.C. §1391(c). Because Aumtech America is headquartered Ventura, California, *see* Decl. of Jennifer Polito ISO Mot. to Dismiss for Improper Venue ¶ 5, ECF No. 43, it would be subject to personal jurisdiction in the Central District of California, which includes Ventura County. Thus, Aumtech America is deemed to reside in the Central District for purposes of determining venue. Defendants claim that Aumtech America does not have sufficient contacts with the Northern District of California to be subject to personal jurisdiction in this district, as it has no clients or employees in this District and has not solicited clients here.

14

**United States District Court**
For the Northern District of California

§ 1391(a)(2) for two reasons: (1) because the contracts underlying this action were entered into with a corporation headquartered in this District and resulted in several years of substantial contacts with this District, and (2) because Defendants are unfairly targeting Plaintiff's customers in this District.

Defendants make a number of arguments as to why the Court should find that venue in the Northern District of California is improper. First, Defendants point out that Plaintiff alleges a course of wrongful conduct that began in 2010 and took place in Southern California and in India. Defendants claim that in 2007, ePayware closed its San Jose office, and of its four employees, three worked out of their homes in Southern California or Nevada and only one worked out of his home in San Jose. Jennifer Polito Venue Decl. ¶¶ 9-10. Thereafter, in October 2009, ePayware was acquired by Richmond Technologies, a Georgia corporation with its principal place of business in Alpharetta, Georgia. *Id.* ¶ 13; Compl. ¶ 12. Richmond Technologies' principals, Rajil Vohra and Sandeep Menon, work out of offices in Alpharetta, and no one contends that Richmond Technologies has offices or employees in the Northern District of California. Jennifer Polito Venue Decl. ¶¶ 13-14. Thus, Defendants argue that by 2010, when Defendants' wrongful conduct allegedly began, no party to this case or to the contracts at issue was located in the Northern District of California.

The American Defendants also question the strength of Defendants' contractual ties to the Northern District of California. Jennifer Polito claims that she signed her contract with ePayware in Las Vegas, Nevada. *Id.* ¶ 7. Shankar Bose likewise claims that he wrote, negotiated, and signed the Memorandum of Understanding from his office in New Delhi, India, and that he also signed the Non-Disclosure Agreement in India. Decl. of Shankar Bose ISO Mot. to Dismiss for Lack of Personal Jurisdiction ("Shankar Bose Jurisdiction Decl.") ¶¶ 7-8, ECF No. 40. It also appears that Defendants performed their contractual obligations in Southern California, Nevada, and India, and only traveled to San Jose once or twice in 2007. *See* Jennifer Polito Venue Decl. ¶¶ 8, 10; Shankar Bose Jurisdiction Decl. ¶¶ 6, 9; Decl. of Ila Bose ISO Mot. to Dismiss for Lack of Personal Jurisdiction ("Ila Bose Jurisdiction Decl.") ¶ 6, ECF No. 41. Finally, Jennifer Polito claims that, to her knowledge, ePayware and Richmond Technologies did not have any clients within the Northern

15

United States District Court
For the Northern District of California

1    District of California, but did have clients in Southern California, including Intuit, International

2    Processing Solutions, Cardready, and APPS.  Jennifer Polito Venue Decl. ¶¶ 11-12.  Although Ms.

3    Polito acknowledges that Intuit has an office in Northern California, she contends that ePayware

4    interacted only with the merchant services department in Southern California.  *Id.* ¶ 12.  At the

5    motion hearing, however, Defendants' counsel conceded that ePayware's contract was likely with

6    Intuit's headquarters in Northern California.

7         If § 1391(a)(2) authorized venue in the *single* district in which the *most* substantial part of

8    the events or omissions giving rise to the claim occurred, the Court would agree with Defendants

9    that venue in the Northern District of California is improper.  However, under the current version of

10   § 1391(a)(2), the circuits appear to agree that venue may be proper in multiple districts if a

11   "substantial part" of the underlying events took place in each of those districts.  *See Gulf Ins. Co. v.*

12   *Glasbrenner,* 417 F.3d 353, 356 (2d Cir. 2005) (collecting cases from various federal courts of

13   appeals).  Thus, Plaintiff need not show that the Northern District of California has the *most*

14   substantial relationship to the dispute, *Kirkpatrick v. Rays Group*, 71 F. Supp. 2d 204, 213

15   (W.D.N.Y. 1999), or that it is the "best" venue.  *Silver Valley Partners, LLC v. De Motte*, 400 F.

16   Supp. 2d 1262, 1269 (W.D. Wash. 2005).  Rather, "for venue to be proper, significant events or

17   omissions material to the plaintiff's claim must have occurred in the district in question, even if

18   other material events occurred elsewhere."  *Gulf Ins. Co. v. Glasbrenner,* 417 F.3d at 357.  Where,

19   as here, a case involves a contract dispute, courts have "looked to such factors as where the contract

20   was negotiated or executed, where it was to be performed, and where the alleged breach occurred"

21   to determine whether venue is proper.  *Id.*  (quotation mark and citation omitted); *see also*

22   *Shropshire v. Fred Rappoport Co.,* 294 F. Supp. 2d 1085, 1094 (N.D. Cal. 2003) (finding venue

23   proper in case turning on contract interpretation because contract was partially negotiated, signed,

24   and substantially performed in the district).

25        The Ninth Circuit has not articulated a clear test for determining whether venue is proper

26   under the current version of § 1391(a)(2).  However, the Ninth Circuit's decision in *Decker Coal*

27   *Co. v. Commonwealth Edison Co.*, 805 F.2d 834 (9th Cir. 1986), provides helpful guidance.  In

28

16

*Decker Coal*, the Ninth Circuit considered the proper venue for an action alleging breach of contract.  Although the case involved an earlier version of § 1391(a), the Court's analysis focused on identifying the district "in which a substantial part of the acts, events, or omissions occurred that gave rise to the claim."  *Id.* at 842.  The Ninth Circuit concluded that in a suit for breach of contract, venue is proper not in the place where the contract was repudiated, but in the place of intended performance.  *Id.*  In so concluding, the Ninth Circuit reasoned that "the place of performance is determined at the inception of the contract and therefore parties can anticipate where they may be sued."  *Id.*

Considering the facts of this case and the reasoning of *Decker Coal*, the Court finds that venue in the Northern District of California is proper.  While the Defendants may have executed and performed their contracts in other locations, courts have recognized that modern technology permits the negotiation and performance of contracts without face-to-face contacts and have found venue proper in a district in which either party to a contract was located.  *See, e.g.*, *Kirkpatrick v. Rays Group*, 71 F. Supp. 2d at 213-14 (discussing cases finding venue proper in district where the defendant never set foot because "technology has advanced to the point that many contractual arrangements may, today, be made without face-to-face meetings").  The Court has already discussed the extent to which Aumtech India's contract tied it to San Jose and required frequent communications with this District.  Jennifer Polito similarly contracted with a San Jose-based corporation and performed services on behalf of the San-Jose based corporation for several years.  The contracts entered into with San Jose-based ePayware form the basis for most of Plaintiff's claims, and they ground this action in events that took place in, or in close connection with, the Northern District of California.  Moreover, under the reasoning of *Decker Coal*, it is appropriate to lay venue in the District in which one party to the contract was located and to which obligations under the contract were due, for that location "is determined at the inception of the contract and therefore parties can anticipate where they may be sued."  *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d at 842.  For these reasons, the Court finds that a substantial part of the events

**United States District Court**
For the Northern District of California

1    giving rise to Plaintiff's claims arose in the Northern District of California.  Accordingly, venue in

2    this District is proper, and Defendants' motion to dismiss for improper venue is DENIED.

3        **IV. Motion for Substituted Service**

4        Having determined that the Court can exercise personal jurisdiction over the Defendants and

5    that venue is proper in this District, the Court turns to Plaintiff's motion for substituted service.  At

6    this time, the three United States-based Defendants – Aumtech America, Damian Polito, and

7    Jennifer Polito – have been properly served.  The India-based Defendants – Aumtech India, Shankar

8    Bose, and Ila Bose – have been notified of the lawsuit by email, but all parties agree that this does

9    not constitute proper service under the Federal Rules of Civil Procedure.  Plaintiff has moved to

10   serve the Indian Defendants by alternative means, pursuant to Rule 4(f)(3), by serving the summons

11   and complaint on the Indian Defendants' counsel, Drew L. Alexis of the Kinaga Law Firm in Los

12   Angeles, California.

13       Federal Rule of Civil Procedure 4(h)(2) provides for service of corporations in a foreign

14   country "in any manner prescribed by Rule 4(f) for serving an individual, except personal delivery

15   under (f)(2)(C)(i)."  Rule 4(f), in turn, provides several means by which a plaintiff may serve an

16   individual "at a place not within any judicial district of the United States."  Pursuant to Rule 4(f)(1),

17   an individual or corporation may be served in a foreign country "by an internationally agreed means

18   of service that is reasonably calculated to give notice, such as those authorized by the Hague

19   Convention on the Service Abroad of Judicial and Extrajudicial Documents."  Rule 4(f)(3) further

20   provides for service "by any other means not prohibited by international agreement, as the court

21   orders."  Fed. R. Civ. P. 4(f)(3).

22       In this case, the unserved Defendants are located in India, which is a signatory to the Hague

23   Convention referenced in Rule 4(f)(1).  The Hague Convention requires signatory countries to

24   establish a Central Authority to receive requests for service of documents from other countries and

25   to serve those documents by methods compatible with the internal laws of the receiving state.  *See*

26   *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 698-99 (1988).  Service through a

27   country's Central Authority is the principal means of service under the Hague Convention.  Article

28

United States District Court
For the Northern District of California

18

10 of Convention also permits other forms of service, such as service "by postal channels" or through judicial officers, provided that the state of destination does not object.[6]  *See* Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters, Nov. 15, 1965 ("Hague Convention"), [1969] 20 U.S.T. 361, T.I.A.S. No. 6638, 1969 WL 97765, Art. 10. However, because India has objected to Article 10, service by mail or through judicial officers is not available.

Here, Plaintiff contends that service through the Central Authority in India would take between six and eight months and requests an order under Rule 4(f)(3) permitting substituted service on the Indian Defendants' attorney in Los Angeles.  In *Rio Properties, Inc. v. Rio Intern. Interlink*, the Ninth Circuit characterized the scope of Rule 4(f)(3) as follows:

> As obvious from its plain language, service under Rule 4(f)(3) must be (1) directed by the court; and (2) not prohibited by international agreement.  No other limitations are evident from the text. . . .
>
> By all indications, court-directed service under Rule 4(f)(3) is as favored as service available under Rule 4(f)(1) or Rule 4(f)(2). . . .  Rule 4(f)(3) is not subsumed within or in any way dominated by Rule 4(f)'s other subsections; it stands independently, on equal footing.  Moreover, no language in Rules 4(f)(1) or 4(f)(2) indicates their primacy, and certainly Rule 4(f)(3) includes no qualifiers or limitations which indicate its availability only after attempting service of process by other means.

284 F.3d 1007, 1014-15 (9th Cir. 2002).  Under the Ninth Circuit's analysis, Rule 4(f)(3) is "neither a 'last resort' nor 'extraordinary relief.'  It is merely one means among several which enables service of process on an international defendant."  *Id.* (citation omitted).

The question in this case is whether service of the Indian Defendants by substituted service on their attorney under Rule 4(f)(3) comports with the Hague Convention.  Although the Supreme Court has stated, in dicta, that "compliance with the Convention is mandatory in all cases to which it applies," *Volkswagenwerk*, 486 U.S. at 705, it has not provided clear guidance as to how the

---

[6] Article 10 reads: "Provided the State of destination does not object, the present Convention shall not interfere with - (a) the freedom to send judicial documents, by postal channels, directly to persons abroad, (b) the freedom of judicial officers, officials or other competent persons of the State of origin to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination, (c) the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination."  Hague Convention, 20 U.S.T. 361, T.I.A.S. No. 6638, Art. 10.

Case No.: 11-CV-02460-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR TRO; GRANTING MOTION FOR SUBSTITUTED SERVICE; DENYING MOTIONS TO DISMISS

1    requirements of the Hague Convention interact with a court's authority to order alternative service

2    under Rule 4(f)(3).  It is clear that a federal court cannot order service under Rule 4(f)(3) "in

3    contravention of" the Hague Convention.  *See Rio Properties, Inc. v. Rio Intern. Interlink*, 284 F.3d

4    1007, 1015 n.4 (9th Cir. 2002) ("A federal court would be prohibited from issuing a Rule 4(f)(3)

5    order in contravention of an international agreement, including the Hague Convention referenced in

6    Rule 4(f)(1).").  However, numerous courts have authorized alternative service under Rule 4(f)(3)

7    even where the Hague Convention applies.  This is true even in cases involving countries that, like

8    India, have objected to the alternative forms of service permitted under Article 10 of the Hague

9    Convention.  *See, e.g.*, *In re LDK Solar Securities Litigation,* No. C 07-05182 WHA, 2008 WL

10   2415186, at *3 (N.D. Cal. June 12, 2008) (permitting service of Chinese defendants under Rule

11   4(f)(3), despite China's objections to Article 10, because the service requested did not involve

12   service by "postal channels"); *Williams-Sonoma Inc. v. Friendfinder Inc.*, No. C 06-06572 JSW,

13   2007 WL 1140639, at *2 (N.D. Cal. Apr. 17, 2007) (permitting service by email, but not by

14   international mail, for defendants in countries that objected to Article 10 of the Hague Convention).

15   *But see Agha v. Jacobs*, No. C 07-1800 RS, 2008 WL 2051061, at *1-2 (N.D. Cal. May 13, 2008)

16   (finding email and fax indistinguishable from "postal channels" and denying motion to serve

17   German defendants by email or fax based on Germany's objection to Article 10).

18          Some courts have reasoned that alternative service may be ordered pursuant to Rule 4(f)(3)

19   as long as the alternative method of service is not expressly prohibited by the Convention or

20   objected to by the receiving state.  *See, e.g.*, *In re LDK Solar Securities Litigation,* 2008 WL

21   2415186, at *3-4 (permitting service of Chinese subsidiary and individual officers by service on

22   parent company in California because such service is not barred by the Hague Convention);

23   *Williams-Sonoma*, 2007 WL 1140639, at *2 (permitting service by email because Hague

24   Convention does not expressly prohibit email service).  Other courts have reasoned that because the

25   Hague Convention only applies if the law of the forum state requires service of documents abroad,

26   *Volkswagenwerk*, 486 U.S. at 700, the Hague Convention is not a barrier to any alternative service

27

28

Case No.: 11-CV-02460-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR TRO; GRANTING MOTION FOR
SUBSTITUTED SERVICE; DENYING MOTIONS TO DISMISS

that will be performed domestically.[7]  *See FMAC Loan Receivables v. Dagra*, 228 F.R.D. 531, 534-35 (E.D. Va. 2005) (ordering service on domestic counsel under Rule 4(f)(3) and finding that Hague Convention would not apply because service would be effected in the United States).

The Advisory Committee Notes to the 1993 Amendment of Rule 4(f)(1) state that when a signatory state to the Hague Convention is "dilatory or refused to cooperate for substantive reasons . . . resort may be had to the provision set forth in subdivision (f)(3)."  The Advisory Committee Notes also indicate that Rule 4(f)(3) is appropriately used in "in cases of urgency if convention methods will not permit service within the time required by the circumstances."  In this case, Plaintiff counsel states that he has researched the Hague Convention requirements for serving Indian nations and has been informed that the process can take six to eight months to complete. Decl. of Shirish Gupta ISO Pl.'s Mot. for Substituted Service ¶ 6, ECF No. 34; *see also Marlabs Inc. v. Jakher*, No. 07-cv-04074 (DMC)(MF), 2010 WL 1644041 (D. N.J. Apr. 22, 2010) (ordering service on Indian defendants' counsel after plaintiff advised that service in India could take in excess of six months and attempted without success to serve defendants).  Plaintiff also claims that it faces a threat of immediate, irreparable harm if it cannot obtain preliminary relief in this action. Defendants have offered no evidence suggesting that service through Hague Convention methods is likely to be completed more efficiently, and, as discussed below, the Court has found that Plaintiff's claims of urgency have merit.  Thus, Plaintiff has presented issues that require resolution with greater urgency than the Hague Convention process can accommodate, and alternative service under Rule 4(f)(3) is warranted.

Service upon a foreign defendant's United States-based counsel is a common form of service ordered under Rule 4(f)(3).  *See Knit With v. Knitting Fever*, Inc., Nos. 08-4221, 08-4775,

_____

[7] *Volkswagenwerk* actually states that "[w]here service on a domestic agent is valid and complete under both state law and the Due Process Clause, our inquiry ends and the Convention has no further implications." 486 U.S. at 707.  It is possible that service of Shankar and Ila Bose by service on their attorney would be valid under California law.  *See Warner Bros. Records, Inc. v. Golden West Music Sales*, 36 Cal. App. 3d 1012, 1018, 112 Cal. Rptr. 71 (Cal. Ct. App. 1974) (finding that if an individual's relationship with his attorney is "sufficiently close and enduring to make it reasonably certain that [he] would be apprised of the service," the attorney may be considered a person authorized to receive service of process under California Code of Civil Procedure § 416.90). However, many district courts simply order appropriate domestic service pursuant to Rule 4(f)(3) without considering the service rules of the forum state.

21

2010 WL 4977944, at *4 (E.D. Pa. Dec. 7, 2010) ("Repeatedly, courts around the country have found that service upon a foreign defendant through counsel is appropriate to prevent further delays in litigation."). Nothing in the Hague Convention prohibits such service. *See RSM Production Corp. v. Fridman*, No. 06 Civ. 11512(DLC), 2007 WL 2295907, at *3 (S.D.N.Y. Aug. 10, 2007) ("The Hague Service Convention does not prohibit an order pursuant to Rule 4(f)(3) permitting service through American counsel."). However, "the method of service crafted by the district court [under Rule 4(f)(3)] must be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Rio Properties*, 284 F.3d at 1016-17 (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)). In this case, the Court is confident that service upon Mr. Alexis of the Kinaga Law Firm is reasonably calculated to apprise the Indian Defendants of the pendency of the action and afford them an opportunity to present their objections. The Indian Defendants already have actual notice of the action, and Mr. Alexis is already representing them for the purpose of contesting personal jurisdiction and opposing substituted service. Mr. Alexis has also stated that he will be filing an action against Plaintiff for non-payment of services rendered by Defendant Aumtech India. Decl. of Andrew L. Alexis in Opp'n to Renewed Mot. for TRO ¶ 7, ECF No. 55. Considering that Shankar and Ila Bose are the principals of Aumtech India, it appears that their relationship with Mr. Alexis is intended to be ongoing. Accordingly, service upon Mr. Alexis in Los Angeles accords with the requirements of due process.

For the reasons discussed above, Plaintiff's motion for substituted service upon the Indian Defendants' counsel pursuant to Rule 4(f)(3) is GRANTED.

## V. Renewed Motion for Temporary Restraining Order

On May 25, 2011, the Court denied Plaintiff's motion for a temporary restraining order ("TRO") without prejudice on grounds that Plaintiff had not satisfied the requirements of Federal Rule 65(b) for issuance of a TRO without notice to the adverse party. *See* Order Denying Ex Parte Motion for TRO Without Prejudice, ECF No. 17. Having served the American Defendants and provided notice by email to the Indian Defendants, Plaintiff now renews its motion for a TRO and

22

Case No.: 11-CV-02460-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR TRO; GRANTING MOTION FOR SUBSTITUTED SERVICE; DENYING MOTIONS TO DISMISS

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

preliminary injunction.  Specifically, Plaintiff seeks preliminary injunctive relief compelling Defendants to turn over Plaintiff's source code and license keys,[8] and enjoining Defendants from further breaching, or assisting in the breach of, the Non-Disclosure Agreement signed by Aumtech India.

### A.  Legal Standard

The standard for issuing a TRO is identical to the standard for issuing a preliminary injunction.  *Brown Jordan Int'l, Inc. v. Mind's Eye Interiors, Inc.*, 236 F. Supp. 2d 1152, 1154 (D. Haw. 2002); *Lockheed Missile & Space Co., Inc. v. Hughes Aircraft Co.*, 887 F. Supp. 1320, 1323 (N.D. Cal. 1995).  A plaintiff seeking a preliminary injunction must make a four-fold showing: (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 129 S.Ct. 365, 374 (2008); *Amer. Trucking Assocs., Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).  The Ninth Circuit has also indicated that a preliminary injunction may issue in cases where the plaintiff shows (1) serious questions going to the merits; (2) a hardship balance that tips sharply towards the plaintiff; (3) a likelihood of irreparable injury; and (4) that the injunction is in the public interest.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).  Under either standard, however, preliminary injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 129 S.Ct. at 376.

### B.  Analysis

#### 1.  Likelihood of Success on the Merits

##### a.  Source Code

In its renewed TRO motion, Plaintiff seeks an injunction compelling Aumtech India and its principals, Shankar and Ila Bose, to turn over the source code and license keys developed for

---

[8] In its renewed motion, Plaintiff also requests an order compelling Defendants to turn over certain hardware, apparently consisting of six computers provided to Aumtech India.  Suppl. Decl. of Sandeep Menon ISO Renewed TRO Mot. ¶ 30.  However, Plaintiff has not adequately explained why it is entitled to this hardware or why it would suffer irreparable harm if it is not returned to Plaintiff.  Accordingly, Plaintiff's motion is denied with respect to the requested hardware.

23

1   Plaintiff, and enjoining all Defendants from further breaching, or assisting in the breach of, the non-

2   compete covenants contained in the Non-Disclosure Agreement between ePayware and Aumtech

3   India.  As to the source code, the parties appear to agree that under the terms of the MoU, the source

4   code developed for ePayware and its clients belongs to ePayware.  However, Aumtech India

5   contends that because it has not been fully compensated for its software development services,

6   Plaintiff is not entitled to obtain the source code until it pays Aumtech India the money owed.  In

7   support of this contention, Shankar Bose has submitted a series of emails documenting ePayware's

8   financial difficulties and its repeated underpayment of invoices issued by Aumtech India.  *See* Decl.

9   of Shankar Bose in Opp'n to Renewed TRO Mot. ("Shankar Bose TRO Decl."), Exs. A-I.  Mr. Bose

10  also submits an email sent from Richmond Technologies principal Rajil Vohra on March 7, 2011, in

11  which Vohra provides a payment plan that would "bring [Plaintiff's] payments back on track in a

12  phased manner in the next 3-4 months time frame."  *Id.* Ex. J.  The payment plans provides for a

13  payment of $15,000 in March 2011, $20,000 in April 2011, $20,000 in May 2011, and $17,000 in

14  June 2011.  *Id.*  Plaintiff contends, and Defendants do not appear to dispute, that it made the

15  $15,000 and $20,000 payments for March and April 2011.  Menon Decl. ¶ 6 & Ex. C.  No payment

16  was made in May, however, and on May 16, 2011, Plaintiff terminated the software development

17  and maintenance agreement with Aumtech India.  *Id.* ¶ 7.

18          Although Aumtech India has not identified the precise amount it believes Plaintiff owes,

19  Shankar Bose has indicated that he would be willing to turn over the source code in exchange for a

20  $20,000 payment.  *Id.* ¶ 9.  Plaintiff, for its part, states that it has paid Aumtech India over $173,000

21  for its development and maintenance services since January 2010, *id.* ¶ 6, and claims that it owes no

22  further payments due to Aumtech India's breach of the Non-Disclosure Agreement.  Indeed, in its

23  Complaint, Plaintiff claims that Aumtech India owes a refund of $156,437 for the payments

24  Plaintiff made after March 5, 2010, the date when Damian Polito filed the fictitious business name

25  statement for Aumtech America.[9]  Compl. ¶ 43.  Thus, the parties' dispute over the source code

26

27  [9] Although it appears that Damian Polito filed the fictitious business name statement on March 5,
    2010, Compl. ¶¶ 13, 43, elsewhere in the Complaint Plaintiff identifies April 2010 as the

28  approximate date that Defendants created Aumtech America.  Compl. ¶ 4.

Case No.: 11-CV-02460-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR TRO; GRANTING MOTION FOR
SUBSTITUTED SERVICE; DENYING MOTIONS TO DISMISS

**United States District Court**
For the Northern District of California

1  centers on whether Plaintiff has performed its financial obligations under the parties' agreement,

2  which in turn depends on whether Aumtech India's alleged breach of the Non-Disclosure

3  Agreement excused Plaintiff from making payments.  Because the Court finds below that Plaintiff

4  has demonstrated a likelihood of success on at least some of its contract claims, the Court finds that

5  Plaintiff is also likely to succeed in establishing an entitlement to the source code.

6  ### b.  Non-Compete Agreements

7  Plaintiff claims that by teaming up with Jennifer Polito to form a competing venture,

8  Aumtech India has breached the non-compete provisions of the Non-Disclosure Agreement.

9  Plaintiff also contends that the remaining Defendants have aided in this breach, and that the

10  Defendants' actions constitute an unfair, deceptive, or fraudulent business practice under the

11  California Unfair Competition Law, Cal. Bus. & Profs. Code § 17200 *et seq.*  Although Defendants

12  vehemently deny that they have used the source code or modules developed for Plaintiff in

13  Aumtech America's merchant services products, they do not deny that Aumtech America directly

14  competes with ePayware.  The question, therefore, is whether Plaintiff is likely to prevail on its

15  claim that this competition constitutes a breach of enforceable contractual provisions or a violation

16  of the California Unfair Competition Law.

17  The Non-Disclosure Agreement between ePayware and Aumtech India contains a number of

18  provisions that bar Aumtech India from competing with ePayware or soliciting its employees,

19  consultants, customers, accounts, or clients within a year after Aumtech India's term of employment

20  with ePayware ends.[10]  *See* Menon Decl. Ex. B at ¶¶ 4-6.  These provisions read as follows:

21  4. <u>Non-Solicitation.</u>  During the Term of this Employment (a[s] hereinafter defined),
and for a period of one year thereafter, Recipient [shall not] directly or indirectly,

22  initiate any contact or communication with, solicit or attempt to solicit the employee
of, or enter into any agreement with any employee, consultant, sales representative, or

23  account manager of EPI [ePayware] unless such person has ceased its relationship
with EPI for a period of not less than six months.  Similarly EPI shall not solicit the

24  employment of, or enter into any agreement with any employee, consultant or
representative of AISPI [Aumtech India].

25

26  [10] The Non-Disclosure Agreement defines the "Term" of the agreement as commencing on
February 16, 2007 and extending until "six months after Recipient no longer has possession of, or

27  access to, Confidential Information."  Menon Decl. Ex. B ¶ 7.  As Aumtech India still has
possession of ePayware's source code, it would seem that the term of the agreement has not yet

28  expired.

Case No.: 11-CV-02460-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR TRO; GRANTING MOTION FOR
SUBSTITUTED SERVICE; DENYING MOTIONS TO DISMISS

    5. <u>Non-Interference.</u>  During the Term of this Employment, and for a period of one year thereafter, Recipient will not initiate any contact or communication with, solicit or attempt to solicit, or enter into any agreement with, any account, acquiring bank, merchant, customer, client, or vendor of EPI in the products created and serviced by EPI, unless (a) such person has ceased its relationship with EPI for a period of not less than six months, or (b) Recipient's relationship and association with such person both (i) pre-existed the date of this Agreement and (ii) does not directly or indirectly conflict with any of the current or reasonably anticipated future business of EPI.

    6. <u>Non Compete and Non Circumvent.</u>  Recipient will not compete with EPI with similar product and or Service using its technology for a period of one year thereafter. Recipient will not use any of the EPI's technical knowhow or Source Code for the personal benefit other than the employment and to meet the customer needs defined by EPI.

*Id.* The Non-Disclosure Agreement also contains a provision that bars Aumtech India from disclosing or using confidential information used in ePayware's business.  *Id.* ¶ 3.  Confidential information is defined to include "Proprietary Data," such as "know-how," contract terms and conditions with merchants, technical data, and source code; "Business and Financial Data"; "Marketing and Developing Operations"; and "Customers, Vendors, Contractors, and Employees," including their names and identities, data provided by customers, and information on the products and services purchased by customers.  *Id.* ¶ 1.  Confidential information does not include any information that is publicly known, becomes publicly known through no wrongful act of Aumtech India, or is disclosed to Aumtech India by a third-party having a right to do so.  *Id.* ¶ 2.

    Defendants argue that Plaintiff is not likely to prevail on its contract claims because the non-solicitation, non-interference, and non-compete provisions in the Non-Disclosure Agreement are unenforceable under California Business and Professions Code § 16600.  Pursuant to Section 16600, "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void," subject to statutory exceptions not relevant here.  Cal. Bus. & Profs. Code § 16600; *see also* Cal. Bus. & Profs. Code § 16601-07 (codifying exceptions for non-compete agreements associated with the sale or dissolution of certain businesses and addressing other special circumstances).  In its recent decision in *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 189 P.3d 285 (2008), the California Supreme Court confirmed the continued viability and breadth of Section 16600.  The Court explained that by enacting Section 16600, the California legislature rejected the "rule of reasonableness" applied to non-compete agreements at common

26

law.  *Edwards*, 44 Cal. 4th at 945.  As a result, "[t]oday in California, covenants not to compete are void, subject to several exceptions," and the California Supreme Court "generally condemns noncompetition agreements."  *Id.* at 945-46.

In discussing the scope of Section 16600, the *Edwards* Court considered a judicially created exception to Section 16600 for limited or narrow restraints applied in several Ninth Circuit cases. *Id.* at 948.  Under this "narrow-restraint" exception, a number of Ninth Circuit cases upheld non-compete agreements that did not entirely preclude a party from pursuing its chosen profession, trade, or business, but only barred the party from pursuing a small or limited part of its business.  *Id.* at 948-49.  After considering the Ninth Circuit decisions and their support in California law, the California Supreme Court rejected the narrow-restraint exception, finding that "California courts have been clear in their expression that section 16600 represents a strong public policy of the state which should not be diluted by judicial fiat."  *Id.* at 949.  The Court concluded that "Section 16600 is unambiguous, and if the Legislature intended the statute to apply only to restraints that were unreasonable or overbroad, it could have included language to that effect."  *Id.* at 950.  Accordingly, Section 16600 stands as a broad prohibition on "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind."  Cal. Bus. & Profs. Code § 16600.

Because the Non-Disclosure Agreement is governed by California law, Menon Decl. Ex. B ¶ 12, Section 16600 would seem to apply and render void any clause that has the effect of restraining Defendants from lawful engagement in the merchant services business.  In its reply brief, Plaintiff argues that Section 16600 does not apply to the Non-Disclosure Agreement because Section 16600 bars only restrictions on employees, or that impact employees, and has no effect on dealings between companies.  The Court, however, finds no support for this proposition in either the statutory language or the case law.  Section 16600 addresses "*every* contract by which *anyone* is restrained from engaging in a lawful profession, trade, or business of *any* kind."  Cal. Bus. & Profs. Code § 16600 (emphasis added).  It is true that *Edwards* distinguished two earlier California cases on grounds that the cases did not provide "any guidance on the issue of noncompetition agreements, largely because neither involved noncompetition agreements in the employment context."

United States District Court
For the Northern District of California

1  *Edwards*, 44 Cal. 4th at 950 n.5.  However, the *Edwards* Court further explained that these two

2  cases were inapposite because one involved a covenant in a deed to a parcel of land, and the other

3  involved a case "in which the court applied a trade secret exception to the statutory rule against

4  noncompetition clauses."  *Id.* at 949.  Contrary to Plaintiff's argument, the *Edwards* Court did not

5  suggest that Section 16600 applies only in the narrow context of an employer-employee

6  relationship.   Nor do the other cases cited by Plaintiff suggest such a rule.  *See General*

7  *Commercial Packaging, Inc. v. TPS Package Engineering, Inc.*, 126 F.3d 1131, 1132-34 (9th Cir.

8  1997) (upholding a non-solicitation agreement under the "narrow-restraint" exception to Section

9  16600); *Southern California Institute of Law v. TCS Educ. System*, No. CV 10–8026 PSG (AJWx),

10  2011 WL 1296602, at *3 & n.2 (C.D. Cal. Apr. 5, 2011) (permitting claims of misuse of

11  confidential information to go forward and noting that the statutory exception to § 16600 for

12  agreements in the sale of corporations applied).  In fact, the *General Commercial Packaging* case

13  cited by Plaintiff explicitly applied Section 16600 to a contract between two corporations that

14  restrained one of the corporations from dealing directly with a third corporation.  *See General*

15  *Commercial Packaging*, 126 F.3d at 1132-34.  *See also VL Systems, Inc. v. Unisen, Inc.*, 152 Cal.

16  App. 4th 708, 61 Cal. Rptr. 3d 818 (Cal. Ct. App. 2007) (applying § 16600 to a contract between a

17  corporation and a company that provided computer consulting services to the corporation).  Thus,

18  the Court finds that Section 16600 is applicable to the facts of this case.

19      The applicability of Section 16600 does not automatically undermine Plaintiff's likelihood

20  of success on the merits, however.  Although California courts have consistently "condemn[ed]"

21  agreements that place restraints on the pursuit of a business or profession, *Edwards*, 44 Cal. 4th at

22  946, "[a]n equally lengthy line of cases has consistently held former employees may not

23  misappropriate the former employer's trade secrets to unfairly compete with the former employer."

24  *Retirement Group v. Galante*, 176 Cal. App. 4th 1226, 1237, 98 Cal. Rptr. 3d 585 (Cal. Ct. App.

25  2009).  Accordingly, "courts have repeatedly held a former employee may be barred from soliciting

26  existing customers to redirect their business away from the former employer and to the employee's

27  new business *if the employee is utilizing trade secret information to solicit those customers*."

1    *Retirement Group*, 176 Cal. App. 4th at 1237 (emphasis in original).  At times, courts have applied

2    this principle to create a "trade secret exception" to Section 16600, pursuant to which a non-

3    compete or non-solicitation clause may be valid under Section 16600 if it is necessary to protect a

4    trade secret.  *See Asset Marketing Systems, Inc. v. Gagnon*, 542 F.3d 748, 758 (9th Cir. 2008)

5    ("Under California law, non-competition agreements are unenforceable unless necessary to protect

6    an employer's trade secret."); *Edwards*, 44 Cal. 4th at 946 n.4 (noting but declining to address the

7    "so-called trade secret exception to section 16600").  Other cases suggest that case law protecting

8    trade secrets does not actually create an exception to Section 16600, but instead enables courts to

9    enjoin the misuse of trade secrets as an independent wrong, either as a tort or a violation of the

10   Unfair Competition Law.  *See Retirement Group*, 176 Cal. App. 4th at 1238; *Dowell v. Biosense*

11   *Webster, Inc.*, 179 Cal. App. 4th 564, 577, 102 Cal. Rptr. 3d 1 (Cal. Ct. App. 2009).

12          Applying these principles to the instant action, the Court finds that the non-solicitation and

13   non-interference provisions in the Non-Disclosure Agreement are likely to be found unenforceable

14   under California law.  These provisions are more broadly drafted than necessary to protect

15   ePayware's trade secrets, and would have the effect of restraining Defendants from pursuing their

16   chosen business and professions if enforced.  *See Dowell*, 179 Cal. App. 4th at 577 (finding clauses

17   void as a matter of law because they were "not narrowly tailored or carefully limited to the

18   protection of trade secrets, but are so broadly worded as to restrain competition").  For instance, the

19   non-solicitation and non-interference provisions broadly prohibit Aumtech India from "enter[ing]

20   into any agreement" with ePayware's clients or employees, regardless of whether Aumtech India

21   initiated the contact or whether the contact resulted in any misuse of trade secrets.  Menon Decl. Ex.

22   B ¶¶ 4-5.  California law simply does not countenance such broad restraints on competition.  *See*

23   *Thompson v. Impaxx, Inc.*, 113 Cal. App. 4th 1425, 1429, 7 Cal. Rptr. 3d 427 (Cal. Ct. App. 2003)

24   ("Antisolicitation covenants are void as unlawful business restraints except where their enforcement

25   is necessary to protect trade secrets."); *Robinson v. Jardine Ins. Brokers Intern. Ltd.*, 856 F. Supp.

26   554, 558-59 (N.D. Cal. 1994) (clause "prohibit[ing] Plaintiff from doing any business with

27   Defendant's clients, regardless of who initiates contact" is likely invalid under § 16600).

28

Case No.: 11-CV-02460-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR TRO; GRANTING MOTION FOR
SUBSTITUTED SERVICE; DENYING MOTIONS TO DISMISS

**United States District Court**
For the Northern District of California

1       As to the non-compete clause, the scope of the prohibitions on "compet[ing] with EPI with

2   similar product and or Service using its technology" and using "technical knowhow" is not entirely

3   clear.  *See* Menon Decl. Ex. B. ¶ 6.  However, if the clause is construed to bar only the use of

4   confidential source code, software, or techniques developed for ePayware products or clients, it is

5   likely enforceable as necessary to protect ePayware's trade secrets.  *See Whyte v. Schlage Lock Co.*,

6   101 Cal. App. 4th 1443, 1456, 125 Cal. Rptr. 2d 277 (Cal. Ct. App. 2002) (stating that a company's

7   technological methods and technical "know-how" are "quintessential" trade secrets); Cal. Civ. Code

8   § 3426.1 (defining "trade secret" to include programs, methods, and techniques that derive

9   independent economic value from not being generally known to the public, provided they are

10  subject to reasonable efforts to maintain their secrecy).  Similarly, the clause prohibiting use of

11  confidential information is likely enforceable to the extent that the claimed confidential information

12  is protectable as a trade secret.

13      Based on the facts provided and the limited briefing of the issue, the Court finds that there

14  are at least serious questions going to the merits of Plaintiff's claims for breach of the non-compete

15  and confidential information clauses and for violations of the Unfair Competition Law.  Plaintiff

16  alleges that Jennifer Polito worked directly with ePayware's clients "to gather their business and

17  technical requirements."  Compl. ¶ 28.  It seems that in her role as Business Analyst, Ms. Polito

18  identified specific client needs and then worked with Aumtech India to develop software tailored to

19  each client.  *Id.*  While Plaintiff has conceded that its client list is publicly available and does not

20  constitute a trade secret, the information gathered by Ms. Polito regarding customer preferences and

21  "specialized requirements" may be protected as a trade secret under California law.  *See Courtesy*

22  *Temporary Service, Inc. v. Camacho*, 222 Cal. App. 3d 1278, 1288, 272 Cal. Rptr. 352 (Cal. Ct.

23  App. 1990) (finding that sophisticated customer information, such as "billing rates, key contacts,

24  specialized requirements and markup rates" constitutes a trade secret); *Lillge v. Verity*, No. C 07-

25  02748 MHP, 2008 WL 906466, at *5 (N.D. Cal. Apr. 1, 2008) ("knowledge of customer

26  preferences and characteristics that would aid the plaintiff in securing and retaining business" may

27  constitute a trade secret).  Information about the technical and business needs of ePayware's clients

28

30

1   is valuable information that is not likely to be publicly available, and it seems that ePayware took

2   steps to protect this information by requiring its employees and contractors to sign non-disclosure

3   agreements.  *See* Cal. Civ. Code § 3426.1.  Similarly, as discussed above, the source code, software,

4   or other technical methods or process developed for ePayware are likely protectable trade secrets

5   that ePayware has taken steps to keep secret.

6          Moreover, Plaintiff has presented evidence suggesting that Defendants may be making use

7   of this trade secret information.  First, Plaintiff makes the basic claim that the KARES software

8   suite marketed by Aumtech America is very similar in structure and function to ePayware's

9   software suite.  Menon Decl. ¶ 17 & Ex. H.  The Court agrees with Defendants that the mere

10   similarity between the parties' products is not sufficient to show that Defendants have used

11   ePayware source code or other trade secrets to develop the KARES software.  *See* Shankar Bose

12   TRO Decl. ¶ 29 (explaining that merchant service providers follow a standard process and therefore

13   software suites may look similar).  However, Plaintiff has submitted evidence of more than mere

14   product similarity.   For instance, Plaintiff makes persuasive allegations that Defendants have taken

15   steps to make it appear as though they, rather than ePayware, directly serve ePayware's clients.  In

16   particular, Plaintiff alleges sometime before the launch of Aumtech America, Aumtech India

17   employees began corresponding with ePayware clients using their Aumtech email accounts, rather

18   than ePayware addresses.  Compl. ¶ 6; Menon Decl. ¶ 20.  Plaintiff also claims that the Aumtech

19   America website lists ePayware clients as though they were clients of Aumtech America.  Compl.

20   ¶ 32.  As to client solicitation, Plaintiff alleges that Aumtech America has directly targeted

21   ePayware's clients, and, in particular, that Jennifer Polito contacted ePayware client First Pay

22   Solutions, LLC, and encouraged it to switch to Aumtech America.  Compl. ¶ 32.

23          In addition, Plaintiff also contends that both Jennifer Polito and Shankar Bose took measures

24   to conceal their activities from ePayware and to delete data needed by ePayware to maintain its

25   relationships with its clients.  Specifically, Plaintiff alleges that after Jennifer Polito resigned from

26   ePayware, she used three different programs ("CCleaner," "Active KillDisk Free Suite," and "R-

27   Wife & Clean 9.3") to delete data from the hard drive of her ePayware-issued laptop before

28

Case No.: 11-CV-02460-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR TRO; GRANTING MOTION FOR
SUBSTITUTED SERVICE; DENYING MOTIONS TO DISMISS

1   returning it to Plaintiff.  Compl. ¶ 30; Suppl. Decl. of Sandeep Menon ISO Renewed TRO Mot.

2   ("Suppl. Menon Decl.") ¶ 28, ECF No. 35.  Plaintiff claims that these programs "wiped all of the

3   slack space on the hard drive and wrote over the areas repeatedly with patterned hex data," such that

4   no Word, Excel, or PowerPoint files could be recovered.  Suppl. Menon Decl. ¶ 28.  Although

5   Jennifer Polito claims that she provided Plaintiff all of her work-related files, Plaintiff maintains

6   that she did not provide her ePayware emails and that at least some document files were destroyed.

7   Reply Br. ISO Renewed TRO Mot. at 2, ECF No. 57.  Similarly, it appears that Shankar Bose

8   deleted all of the emails in his ePayware account.  Suppl. Menon Decl. ¶ 29.  Plaintiff claims that

9   the loss of these emails will make it more difficult for Plaintiff to transition its customers to a new

10  vendor, as these emails contained a history of the issues each customer faces and the responses

11  provided by Aumtech India.  *Id.*

12          Although this evidence is certainly not dispositive, when considered as a whole, it is

13  suggestive of deceptive activity and supports an inference that Defendants sought to appropriate

14  confidential information for their own use and to interfere with Plaintiff's access to that

15  information.  Accordingly, based on this information, and subject to new information or arguments

16  that may be presented in opposition to a preliminary injunction, the Court finds that Plaintiff has

17  established at least serious questions going to the merits of its claims that Defendants have engaged

18  in unfair competition and breach, or interfered with, the non-compete and confidential information

19  provisions of the Non-Disclosure Agreement.

20                      **2.       Irreparable Harm**

21          The Court also finds that Plaintiff has demonstrated that it is likely to suffer irreparable harm

22  in the absence of a temporary restraining order.  Ordinarily, economic injury is not considered

23  irreparable, as it may be remedied by monetary damages.  *Rent-A-Center, Inc. v. Canyon Television*

24  *and Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991).  However, the Ninth Circuit has

25  recognized that "intangible injuries, such as damage to ongoing recruitment efforts and goodwill,

26  qualify as irreparable harm."  *Id.*; *see also MySpace, Inc. v. Wallace*, 498 F. Supp. 2d 1293, 1305

27

28

Case No.: 11-CV-02460-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR TRO; GRANTING MOTION FOR
SUBSTITUTED SERVICE; DENYING MOTIONS TO DISMISS

**United States District Court**
For the Northern District of California

1    (C.D. Cal. 2007) ("Harm to business goodwill and reputation is unquantifiable and considered

2    irreparable.").

3        Here, as to the source code and licensing keys, Plaintiff has submitted declarations stating

4    that it requires the code and keys in order to fulfill its maintenance obligations to its clients.  Menon

5    Decl. ¶¶ 11-12; Suppl. Menon Decl. ¶¶ 24-27.  Plaintiff represents that since May 23, 2011, at least

6    four of its customers, including two of its largest customers, have complained about the lack of

7    support and maintenance for their ePayware modules, and that others have been asking for their

8    license keys.  Suppl. Menon Decl. ¶¶ 24-25.  Plaintiff also states that approximately 85% of its

9    revenue over the past year has come from its enterprise resource planning software, and that it has

10   had to furlough staff due to its inability to maintain this software without the source code.  Third

11   Decl. of Sandeep Menon INSO Renewed TRO Mot. ("Third Menon Decl.") ¶¶ 33-34.  There is

12   some dispute as to whether the source code is required to provide routine maintenance to ePayware

13   customers, or whether it is only required to make amendments or changes to a client's system.

14   Shankar Bose TRO Decl. ¶ 13.  Even if the code is required only for modifications, however, the

15   Court is persuaded that Plaintiff requires immediate access to the code and keys in order to respond

16   quickly to its clients' needs.  The Court finds it quite likely that if Plaintiff is continually unable to

17   provide a license key or make modifications to a client's software when requested, Plaintiff will

18   lose the good will of its clients, and its business reputation will suffer.

19       Similarly, to the extent that Defendants are using Plaintiff's trade secrets to compete with

20   Plaintiff and to encourage Plaintiff's customers to switch their accounts to Aumtech America, the

21   Court agrees that Plaintiff has shown a likelihood of irreparable harm.  Plaintiff represents that the

22   enterprise resource planning software market is quite competitive, Menon Decl. ¶ 21, and suggests

23   that it may have already lost a customer to Aumtech America.  *Id.* ¶ 15.  Moreover, to the extent

24   that Aumtech America's website lists ePayware customers as if they were Aumtech America

25   customers, Plaintiff faces likely damage to its business reputation and confusion in the marketplace

26   that may be difficult to remedy.  If Defendants are permitted to compete with Plaintiff, over the

27   course of this lawsuit, through the misuse of trade secret information, the Court must agree that this

28

would likely result in some loss of clients to Plaintiff and a decline in business reputation and goodwill that is sufficient to establish irreparable harm.

### 3.     Balance of Equities

As to the balance of equities, if the Court imposes only a narrow temporary restraining order, the balance of equities will tip significantly in favor of Plaintiff.  The Court has already found that Plaintiff is likely to suffer irreparable harm in the absence of a temporary restraining order. Because of the restrictions of California Business and Professions Code § 16600, any TRO imposed by the Court would be narrowly tailored to prohibit only the misuse of trade secrets and would permit Defendants to compete, in a lawful manner, with Plaintiff.  Such an order would not cause any hardship to Defendants, beyond the basic requirement that they comply with laws prohibiting unauthorized use of another's trade secrets.  Defendants would be free to market any products not based upon Plaintiff's source code or other trade secrets, and could enter into agreements with Plaintiff's existing customers, so long as they did not solicit those agreements using confidential client information.  Such a narrow injunction should permit Defendants to pursue a lawful competing enterprise without undue restrictions.  As to the source code, Defendants concede at the motion hearing that turning it over would cause them no harm, and they are merely concerned with obtaining the funds they contend Plaintiff owes them.  Accordingly, assuming a narrow injunction with an appropriate bond, the Court finds that the equities tip significantly in favor of Plaintiff.

### 4.     Public Interest

Finally, as to the public interest, the Court finds this factor to favor a narrowly tailored temporary restraining order.  As discussed above, California has a "settled legislative policy in favor of open competition and employee mobility."  *See Edwards*, 44 Cal. 4th at 946.  At the same time, the State also has a strong history of protecting trade secrets from misuse.  *See Retirement Group*, 176 Cal. App. 4th at 1237.  Although a broad injunction would clearly intrude upon the policy in favor of open competition, the Court believes that a narrowly tailored injunction will serve the policy of protecting Plaintiff's trade secrets, while permitting Defendants to compete within the bounds of the law.

34

### C. Scope of Temporary Restraining Order and Bond

Based on the above analysis, the Court finds that issuance of a temporary restraining order is warranted. However, in light of the restrictions of Section 16600 and California's policy in favor of open competition, the Court will issue only a narrow TRO, as follows:

(1) After Plaintiff deposits $20,000 with the Court as bond, Defendants shall turn over all of the current source code and license keys developed for ePayware clients that have not yet been released to Plaintiff.

(2) Defendants are temporarily enjoined from listing current ePayware customers on the Aumtech America website in a manner that suggests those customers are Aumtech America customers.

(3) Defendants are temporarily enjoined from initiating contact with current ePayware customers or clients regarding Aumtech America's enterprise resource planning software, unless none of the Defendants had knowledge of or contact with those customers during their terms of employment with ePayware. However, Defendants may engage in marketing efforts directed at the merchant services market as a whole, such as attending trade shows.

(4) Defendants are temporarily enjoined from using ePayware's information about its customers' technical and business requirements, or other confidential client information, to solicit or obtain agreements with those customers. However, Defendants may enter into agreements with ePayware's customers if the customer initiates the contact and none of ePayware's confidential information will be used in negotiating, executing, or performing the agreement.

(5) Defendants are temporarily enjoined from using any of ePayware's source codes, software, methods, techniques, or other trade secret information in Aumtech America's products or services. However, Defendants may provide and market similar, competing products and services, so long as none of ePayware's trade secrets are used in those products or services.

United States District Court
For the Northern District of California

### D.  Preliminary Injunction Hearing

Because issues of personal jurisdiction, venue, and service remained uncertain at the time of the June 23, 2011 hearing, the Court indicated that any injunctive relief would be ordered as a temporary restraining order, with further briefing regarding a preliminary injunction to follow.  At the hearing, Defendants indicated that they would like two weeks after the issuance of a TRO to brief Plaintiff's motion for a preliminary injunction.  The parties indicated that they would be amenable to holding the preliminary injunction hearing on August 1, 2011.  Pursuant to Federal Rule of Civil Procedure 65(b)(2), a TRO issued without notice to the adverse party expires after 14 days, unless the court extends the TRO for good cause or the adverse party consents to an extension. Here, the TRO was issued with notice, and the adverse party has consented to an extension of the 14-day period.

Accordingly, the Court hereby ORDERS Defendants to show cause why a preliminary injunction should not issue.  Defendants' opposition is due July 15, 2011.  Plaintiff's reply is due July 22, 2011.  The Court will hold a hearing on August 1, 2011 at 2 p.m.  Although the Court has only required a $20,000 bond in conjunction with the TRO, the Court anticipates that additional bond may be appropriate if a preliminary injunction issues.  The parties are instructed to fully brief the issue of an appropriate bond amount, as well as any other issues that may affect the Court's analysis.

### VI. Conclusion

For the foregoing reasons, the Court GRANTS Plaintiff's motion for substituted service, DENIES Defendants' motions to dismiss, and GRANTS in part and DENIES in part Plaintiff's motion for a temporary restraining order.  Defendants are ORDERED to show cause why a preliminary injunction should not issue.  The Court will hold a hearing on Plaintiff's motion for preliminary injunction, including the issue of bond, on August 1, 2011 at 2:00 p.m.

**IT IS SO ORDERED.**

Dated: July 1, 2011

_Lucy H. Koh_
_____
LUCY H. KOH
United States District Judge

36

Case No.: 11-CV-02460-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR TRO; GRANTING MOTION FOR
SUBSTITUTED SERVICE; DENYING MOTIONS TO DISMISS